UNITED STATES of America and Charles A. Bowsher, Comptroller General of the United States of America,

v.

McDONNELL DOUGLAS CORPORATION, Appellant.

No. 83–2119.

United States Court of Appeals, Eighth Circuit.

Submitted May 16, 1984.

Decided Dec. 19, 1984.

---

1. The Honorable Harold D. Vietor, United States District Judge for the Southern District of Iowa.

Gary T. Carr, St. Louis, Mo., for appellant.

Stuart A. Licht, JD, Washington, D.C., for appellee.

Before LAY, Chief Judge, FLOYD R. GIBSON, Senior Circuit Judge, and FAGG, Circuit Judge.

FAGG, Circuit Judge.

This is an appeal by McDonnell Douglas Corporation (MDC) from a district court order directing it to produce certain documents subpoenaed by the Comptroller General of the United States (CG). After a careful review, we affirm.

## I. Background

In 1976 the United States Air Force entered into a contract with MDC for the purchase of aircraft ultimately destined for the Republic of Korea. The negotiated contract price of over $80,000,000 was arrived at on the basis of MDC's cost projections plus a profit equal to 18% of the contract price.

In 1978, General Accounting Office (GAO) auditors initiated a review of the contract as part of a study of Department of Defense (DOD) procedures for awarding major procurement contracts. GAO auditors discovered that MDC's cost projections for tooling and design engineering costs were far above the actual costs incurred in completing the contract. As a result, MDC's profit amounted to 42% of the contract price rather than the contemplated 18%.

During the course of further investigations, GAO auditors were informed by MDC representatives that MDC's manufacturing division had prepared for in-house use an estimate of the tooling hours required in manufacturing the aircraft. Believing that any in-house estimates of tooling and design engineering costs would be useful in discovering whether MDC was aware that it had misrepresented its projected costs to the Air Force, GAO auditors submitted a written demand for the in-house documents in September of 1978.

After negotiations between the CG and MDC proved unproductive, the CG served MDC with a subpoena for the documents in March of 1981. The CG's subpoena enforcement proceeding was dismissed without prejudice in December of that year. 93 F.R.D. 360 (Mo.1981). In January of 1982, the CG again served MDC with a subpoena for the documents, and upon noncompliance with the subpoena, the CG commenced this action in district court. MDC then filed a notice of appeal with the Armed Services Board of Contract Appeals (ASBCA) contesting the CG's subpoena. The ASBCA dismissed MDC's appeal as premature because MDC had failed to present its dispute to the Contracting Officer, as required by the Contract Disputes Act of 1978, before seeking relief from the ASBCA.

MDC filed several motions opposing enforcement of the subpoena. In July of 1983, however, the district court ordered MDC to produce the subpoenaed docu-

ments. It further ordered that execution of the order to produce be stayed pending resolution of this appeal. MDC challenges the district court's order to produce on several grounds.

## II. Jurisdiction

MDC contends that the district court was without jurisdiction to decide this case. It is MDC's position that the Contract Disputes Act of 1978, 41 U.S.C. § 601 *et seq.*, gives exclusive jurisdiction over this matter to the ASBCA. According to MDC, if this court finds the ASBCA to be without exclusive jurisdiction, we should invoke the doctrine of primary jurisdiction in favor of the ASBCA. Finally, MDC argues that 31 U.S.C. § 54(c) (Supp. IV 1980) (recodified at 31 U.S.C. § 716(c) (1982)), which grants the CG a narrow subpoena power and the right to seek enforcement of that power in district court, violates the constitutional doctrine of Separation of Powers.

### A. Exclusive Jurisdiction

"[T]he Comptroller General may require by subpoena the production of books, records, correspondence, memoranda, papers, and documents of contractors * * * to which he has access by law or by agreement of the non-Federal person from whom access is sought." 31 U.S.C. § 54(c)(1) (Supp. IV 1980). The CG claims access to the documents subpoenaed by virtue of an access to records clause (access clause) included in the parties' contract. The access clause provides:

> The Contractor agrees that the Comptroller General of the United States or any of his duly authorized representatives shall, until the expiration of three years after final payment under this contract * * *, have access to and the right to examine any directly pertinent books, documents, papers, and records of the Contractor involving transactions related to this contract.

MDC argues that, assuming the constitutionality of the subpoena enforcement power granted the CG under section 54(c), the CG must establish a right of access to the

documents subpoenaed. The access clause incorporated in the parties' contract provides the CG access to "directly pertinent" records involving transactions relating to the contract. MDC argues that whether the documents subpoenaed are documents falling within the "directly pertinent" language of the access clause is a legitimate contract dispute over the proper interpretation of the access clause. According to MDC, exclusive jurisdiction for resolving this contract dispute is vested in the ASBCA. We cannot agree.

The Contract Disputes Act of 1978 provides a comprehensive statutory system of remedies for resolving government contract disputes. The Act applies "to any express or implied contract * * * entered into by an executive agency for—(1) the procurement of property." 41 U.S.C. § 602(a)(1). We need not decide the applicability of the Contract Disputes Act to the contract entered into by MDC and the Air Force for the procurement of aircraft for the Republic of Korea. The mere existence of the Contract Disputes Act does not alter the authority granted the district court in section 54(c)(2) of the General Accounting Office Act of 1980 to enforce subpoenas issued by the CG under section 54(c)(1). The power to enforce a subpoena issued under section 54(c)(1) necessarily carries with it the power to determine if enforcement is proper. In this regard, the district court must determine, among other things, whether the subpoena was issued for a lawful purpose and requests information relevant to that lawful purpose. *Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 208–09, 66 S.Ct. 494, 505–06, 90 L.Ed. 614 (1946). A determination as to whether the subpoena requests information relevant to the lawful purpose for which it was issued requires the district court to interpret the scope of the access clause of the contract. We disagree with MDC's contention that the Contract Disputes Act of 1978 precludes the district court from interpreting the proper scope of the access clause under the authority of 31 U.S.C. § 54(c)(2) (Supp. IV 1980).

### B. Primary Jurisdiction

MDC argues that the question of whether the documents subpoenaed are documents falling within the reach of the access clause of the contract is a matter within the special expertise of the ASBCA. Accordingly, MDC asks that we vacate the judgment of the district court and reverse its denial of MDC's motion to dismiss or stay these proceedings pending resolution of MDC's appeal from the decision of the ASBCA to the Federal Circuit. The Federal Circuit, however, has stayed the proceedings before it pending the outcome of this appeal. We decline to grant the relief requested by MDC.

■ The doctrine of primary jurisdiction is a flexible tool used to allocate "business between court and agency, and should seldom be invoked unless a factual question requires both expert consideration and uniformity of resolution." *Locust Cartage Co. v. Transamerican Freight Lines, Inc.,* 430 F.2d 334, 340 n. 5 (1st Cir.1970), *cert. denied,* 400 U.S. 964, 91 S.Ct. 365, 27 L.Ed.2d 383 (1971). A court "should be reluctant to invoke the doctrine of primary jurisdiction, which often, but not always, results in added expense and delay to the litigants where the nature of the action deems the application of the doctrine inappropriate." *Mississippi Power & Light Co. v. United Gas Pipe Line Co.,* 532 F.2d 412, 419 (5th Cir.1976), *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1109, 51 L.Ed.2d 541 (1977). "In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." *United States v. Western Pacific Railroad,* 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). It is inappropriate to invoke the doctrine of primary jurisdiction in a case in which Congress, by statute, has decided that the courts should consider the issue in the first instance. *Mississippi Power & Light Co.,* 532 F.2d at 419. This is such a case. Congress, in legislating section 54(c)(2), specifically entrusted the district courts with enforcement of subpoenas issued under the authority of section 54(c)(1). As previously stated, an enforcement decision under section 54(c)(2) necessitates interpreting the scope of the access clause of the parties' contract.

### C. Separation of Powers Doctrine

If a party refuses to comply with a subpoena issued under the authority of section 54(c)(1), the CG is authorized to initiate a subpoena enforcement proceeding in district court. 31 U.S.C. § 54(c)(2) (Supp. IV 1980). MDC contends that the initiation of lawsuits to effectuate the enforcement of legal rights and duties through the courts constitutes execution of the laws of the United States. Under the Constitution, the power and discretion to execute the laws is lodged solely with the executive branch. *Springer v. Philippine Islands,* 277 U.S. 189, 201–02, 48 S.Ct. 480, 482, 72 L.Ed. 845 (1928). Because the CG is an agent of the legislative rather than the executive branch of government, MDC argues that the authority granted the CG under section 54(c)(2) violates the constitutional doctrine of Separation of Powers. We cannot accept MDC's argument.

■ "The power of Congress to conduct investigations is inherent in the legislative process." *Watkins v. United States,* 354 U.S. 178, 187, 77 S.Ct. 1173, 1179, 1 L.Ed.2d 1273 (1957). The power to investigate is necessarily incident to the power to legislate and to do so wisely. *See Quinn v. United States,* 349 U.S. 155, 160–61, 75 S.Ct. 668, 672–73, 99 S.Ct. 964 (1955). The GAO, headed by the CG, serves as an investigative and auditing arm of Congress. The CG, as an overseer of executive branch programs and expenditures, is responsible for investigating all matters relating to the receipt, disbursement, and use of public money, and for making recommendations looking to greater economy or efficiency in public expenditures. 31 U.S.C. § 53 (recodified at 31 U.S.C. § 712); *Bowsher v. Merck & Co.,* 460 U.S. 824, 103 S.Ct. 1587, 1593, 75 L.Ed.2d 580 (1983).

In the General Accounting Office Act of 1980, Congress gave the CG an effective

tool for carrying out its investigative function—the power to subpoena records to which the CG has access by law or by agreement, 31 U.S.C. § 54(c)(1) (Supp. IV 1980), and the power to initiate subpoena enforcement proceedings in district court, 31 U.S.C. § 54(c)(2) (Supp. IV 1980). "Issuance of subpoenas * * * has long been held to be a legitimate use by Congress of its power to investigate." *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 504, 95 S.Ct. 1813, 1821, 44 S.Ct. 324 (1975) (citing *Watkins,* 354 U.S. at 188, 77 S.Ct. at 1179). As stated by the Court in *Buckley v. Valeo:*

> A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information—which not infrequently is true—recourse must be had to others who do possess it. Experience has taught that mere requests for such information often are unavailing, and also that information which is volunteered is not always accurate or complete; *so some means of compulsion are essential to obtain what is needed.* All this was true before and when the Constitution was framed and adopted. In that period the power of inquiry—*with enforcing process*—was regarded and employed as a necessary and appropriate attribute of the power to legislate—indeed, was treated as inhering in it.

424 U.S. 1, 138, 96 S.Ct. 612, 691, 46 L.Ed.2d 659 (1976) (quoting *McGrain v. Daugherty,* 273 U.S. 135, 175, 47 S.Ct. 319, 329, 71 L.Ed. 580 (1927) (emphasis added).

The GAO, in an effort to gather information that would help Congress decide whether public money has been used and expended economically and efficiently, undertook a study of DOD procedures for awarding major procurement contracts. The GAO sought to determine whether the DOD was adhering "to prescribed laws, regulations, and procedures in negotiating noncompetitive contract prices" and "whether the prices negotiated for major

programs and systems [were] reasonable based on cost or pricing data available to the contractors at the time of contract negotiations." The GAO also sought to identify instances of potentially defective pricing due to the submission of incomplete, inaccurate, or noncurrent pricing data.

█ Because MDC was one of the top fifteen contractors with the DOD during the year 1976, the GAO sought to review all major noncompetitive contracts negotiated by the parties during the previous two years. Far from being a case in which the CG brought suit against MDC for breaching the law, the CG, in this case, was merely seeking information for a legitimate investigative purpose. Its issuance of a subpoena enforceable in district court was necessary to accomplish that purpose. To hold otherwise would be to render meaningless the CG's role as an investigating arm of Congress. We reject MDC's Separation of Powers argument.

## III. Enforceability of the Subpoena

MDC initially contends that this case does not involve a routine subpoena enforcement proceeding but rather involves a contract dispute over the proper interpretation of the access clause incorporated into the parties' contract. It is MDC's position that it was entitled to a plenary hearing on the matter in district court. MDC further argues that even if we view the case as a routine subpoena enforcement proceeding, we should conclude that the requirements for enforcement of a subpoena as espoused by the Court in *Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 209, 66 S.Ct. 494, 505, 90 L.Ed. 614 (1946), have not been met.

Contrary to the contention of MDC, this is a subpoena enforcement proceeding brought under the authority of 31 U.S.C. § 54(c)(2) (Supp. IV 1980). Accordingly, we find the *Oklahoma Press* test applicable to this case. *See Bowsher v. Merck & Co.,* 460 U.S. 824, 103 S.Ct. 1587, 1606, 75 L.Ed.2d 580 (1983) (White, J., concurring in part and dissenting in part). Our review

leads us to conclude that the *Oklahoma Press* requirements have been met and the district court properly ordered MDC to produce the subpoenaed documents.

In *Oklahoma Press,* the Supreme Court articulated a four-part test for determining whether a corporation could properly be ordered to produce subpoenaed corporate records and papers. A production order is proper if: (1) the subpoena was issued pursuant to lawful authority, (2) the subpoena was issued for a lawful purpose, (3) the subpoena requests information which is relevant to the lawful purpose, and (4) the disclosure sought is not unreasonable. 327 U.S. at 208–09, 66 S.Ct. at 505–06. *See United States v. Morton Salt Co.,* 338 U.S. 632, 652–53, 70 S.Ct. 357, 368–69, 94 L.Ed. 401 (1950). MDC does not contend that the disclosure sought is unreasonable and thus we need not consider that question. We address the first three requirements of the *Oklahoma Press* test in turn.

A. Lawful Authority

■ First, we find that the subpoena for MDC's records was issued under the lawful authority of 31 U.S.C. § 54(c)(1) (Supp. IV 1980). Section 54(c)(1) permits the CG to subpoena the records of contractors "to which he has access by law or by agreement of the non-Federal person from whom access is sought." In this case, the CG has access to MDC's records by virtue of MDC's agreement with the Air Force to include the "access clause" in the parties' contract.

The Armed Services Procurement Act, 10 U.S.C. § 2301 *et seq.,* applies to contracts for the purchase of aircraft entered into by the Air Force, whether for the Air Force's use or otherwise, where payment is to be made from appropriated funds. 10 U.S.C. § 2303. MDC contends that because the aircraft manufactured by MDC were ultimately destined for the Republic of Korea and the Korean government deposited funds to pay for the aircraft in a Foreign Military Sales Trust Account, the contract does not fall within the confines of the Armed Services Procurement Act. Conse-

quently, according to MDC, the directive of 10 U.S.C. § 2313(b) that the access clause be included in all contracts negotiated under 10 U.S.C. § 2301 *et seq.* does not apply to the contract between MDC and the Air Force. MDC argues that since there is no statutory authority mandating inclusion of the access clause in the parties' contract, MDC's documents are not subpoenable under 31 U.S.C. § 54(c)(1) (Supp. IV 1980).

We find it unnecessary to resolve the issue of whether the access clause was necessarily incorporated in the parties' contract under the directive of 10 U.S.C. § 2313(b). Section 54(c)(1) allows the CG to subpoena the records of contractors "to which he has access by law or *by agreement."* 31 U.S.C. § 54(c)(1) (Supp. IV 1980) (emphasis added). The agreement need not be between the CG and the non-federal party because the CG "typically has no occasion to enter into such agreements[.] [R]ather, a statutory provision or *other source* which binds the party to afford access to the Comptroller would be sufficient." S.Rep. No. 570, 96th Cong., 2d Sess. 5–6, *reprinted in* 1980 U.S.Code Cong. & Ad.News 732, 736–37 (emphasis added). MDC specifically agreed to the inclusion of the access clause in its contract with the Air Force. MDC cannot now be heard to complain about the consequences of its agreement. MDC's documents were properly subpoenaed under the lawful authority of section 54(c)(1).

B. Lawful Purpose

Second, we find that the CG's subpoena was issued for a lawful purpose. The legislative history of the GAO Act reveals that, in granting the GAO the power to subpoena the records of government contractors to which it has access by law or agreement, Congress sought to improve the GAO's ability to discharge its functions as an investigative and auditing arm of Congress. S.Rep. No. 570, 96th Cong., 2d Sess. 1, *reprinted in* 1980 U.S.Code Cong. & Ad.News 732. In particular, Congress sought to improve the GAO's ability to evaluate the economy, efficiency and effec-

tiveness of program operations by the executive branch. *Id.* at 2, 1980 U.S.Code Cong. & Ad.News at 733.

■ The GAO, in order to gather information useful to Congress in its legislative role, undertook a study of DOD procedures for awarding major procurement contracts. The CG chose to review all contracts negotiated in the past two years between the DOD and two of the DOD's top fifteen contractors for the year 1976. As one of the top fifteen contractors, MDC's contracts were chosen for review and its contract with the Air Force for the procurement of aircraft for the Republic of Korea fell within the time frame specified. As we have previously stated, the study was designed: (1) to determine whether the DOD was negotiating reasonable prices in procuring property from contractors; (2) to determine whether it was following prescribed laws and regulations in negotiating contract prices; and (3) to identify instances of defective pricing on the part of DOD contractors. We find ample support for the CG's subpoenaing of the corporate records in this case. *See* 31 U.S.C. § 53(a) (recodified at 31 U.S.C. § 712(1)); 31 U.S.C. § 60 (recodified at 31 U.S.C. § 712(3)); 31 U.S.C. § 1154(a) (recodified at 31 U.S.C. § 717(b)); 31 U.S.C. § 53(c) (recodified at 31 U.S.C. § 719(c)(1)). We conclude that the CG issued the subpoena to MDC for a lawful purpose.

### C. Relevance of Documents Subpoenaed

■ We also have no question that the documents subpoenaed are relevant to the CG's legitimate inquiry. The subpoena in this case was issued under the authority of section 54(c)(1) for documents to which the CG has access by agreement. The access clause in the parties' contract permits the CG to examine any records of the contractor that directly pertain to or involve transactions relating to the contract. We must determine therefore if the documents subpoenaed are directly pertinent to and involve transactions relating to the contract. We conclude that they do.

In enacting the access to records clause, Congress sought to provide the CG with the ability "to look behind the rate [price] which had been established" in government contracts and to deter "excessive" contract prices and "improprieties in the negotiation of Government contracts." 97 Cong.Rec. 13,198 (1951). Recently in *Bowsher v. Merck & Co.*, 103 S.Ct. at 1592, the Supreme Court addressed the reach of the access clause in a case involving a fixed-price contract. The Court stated that records "directly pertain" to the contract within the meaning of the access clause if there is "some close connection between the type of records sought and the particular contract." *Id.* Any records "that bear directly on the question whether the government paid a fair price for the goods or services it purchased are 'directly pertinent' to the contract of purchase." *Id.* at 1604 (White, J., concurring in part and dissenting in part). "Direct costs certainly pertain directly to even a fixed-price contract, for direct costs are, by definition, readily identifiable as attributable to the specific product supplied under the contract." *Id.* at 1597.

We are convinced that the documents subpoenaed by the CG are directly pertinent to the contract in question. MDC and the Air Force entered into a cost-based contract in which the contract price was based on MDC's cost projections plus a profit equal to 18% of the contract price. The CG has subpoenaed records of MDC which estimate the "tooling and design engineering costs" incurred under the contract. The records may represent estimates of direct costs MDC expected to incur in completing its contract with the Air Force. They may prove very useful in determining whether MDC knew that the cost projections submitted to the Air Force were far above the actual costs it expected to incur in completing the project.

As a final note, we indicate the belief that our holding in this case is fully consistent with the holding in *Bowsher*. In *Bowsher*, the Supreme Court held that records of costs incurred in the areas of

research and development, marketing and promotion, distribution, and administration, except to the extent the costs could be allocated to the particular contract in question, were indirect costs not "directly pertinent" to the contract in question. *Id.* at 1596. In so holding, the Court noted that if the contract in question were a cost-based contract as compared to a fixed-price contract, the contractor would be in no position to complain about the intrusiveness of a GAO inspection of indirect cost records. *Id.* at 1597 n. 17. In our view, the access to records clause permits inspection of cost records "when the contract price itself varie[s] according to costs." *Id.* at 1608 (Blackmun, J., concurring in part and dissenting in part). We are confident that in this case, involving a subpoena for records reflecting estimates of direct costs to be incurred in completing a cost-based contract, the Supreme Court would view the records as "directly pertinent" to the contract in question.

## IV. Timeliness of the CG's Request

The access to records clause included in the contract between MDC and the Air Force provides the CG access to directly pertinent records "until the expiration of three years after final payment under this contract." MDC argues that the date of final payment under the contract is the date upon which contract performance and contract payment are substantially complete. According to MDC, final payment occurred in February of 1978. The CG, on the other hand, argues that final payment occurs on the date the last act of paying occurs. According to the CG, final payment on the contract was in January of 1981.

We believe that the CG's request for records within three years of final payment satisfactorily complies with the time limitation specified in the access clause. In our view, a request for the records establishes entitlement to access and examination for timeliness purposes, and that entitlement continues until a right of access to the particular records is either confirmed or

denied by all available procedures. Not only is there an absence of language in the access clause itself that would indicate the necessity of commencing an action within three years of final payment, but the legislative history of the clause indicates that the three-year period was to serve as a housekeeping measure for contractors. The access clause was designed not only to limit the time within which the CG could request access to records but to eliminate any uncertainty as to how long contractors are expected to preserve their records. 97 Cong.Rec. 13,375 (1951). Hence, a definite request for the documents within three years from final payment under the contract would serve to notify a contractor of the necessity of preserving its records and alert the contractor to the prospect of litigation if access is denied.

The parties do not dispute that the CG first made a written request for MDC's records in September of 1978. Thus, under either party's interpretation of the final payment date, the CG's request was timely. As a final note, we point out that the CG and MDC engaged in extensive negotiations, that ultimately proved unsuccessful, prior to the CG's issuance of a narrowly drawn subpoena in this case. Consequently, we need not address the situation in which there is an undue delay by the CG in bringing a subpoena enforcement proceeding.

## V. Nature of the Proceedings and Findings Below

MDC contends that it was inappropriate for the district court to resolve the issues before it by summary proceedings. According to MDC, resolution of the subpoena enforcement action by use of summary proceedings was an abuse of the district court's discretion and in violation of MDC's due process rights under the Fifth Amendment. MDC further contends that we must vacate the judgment of the district court and remand this case to it for findings of fact and separately stated conclusions of law. We cannot agree.

## A. Abuse of Discretion

█ Under Rule 81(a)(3) of the Federal Rules of Civil Procedure, the district court has discretion to deny hearings or limit the applicability of discovery in a proceeding to compel the production of documents in accordance with a subpoena issued by an officer or agency of the United States. *United States v. Lask*, 703 F.2d 293, 300 (8th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 104, 78 L.Ed.2d 107 (1983); *United States v. National Bank of South Dakota,* 622 F.2d 365, 367 (8th Cir.1980). MDC claims that the district court improperly dispensed with the federal rules in this case because the CG is not an officer or agency of the United States as required by Rule 81(a)(3). An "officer of the United States" has long been defined as an officer nominated by the President, by and with the consent of the Senate. *United States v. Mouat,* 124 U.S. 303, 307, 8 S.Ct. 505, 506, 31 L.Ed. 463 (1888). The Comptroller General of the United States is appointed by the President by and with the consent of the Senate. 31 U.S.C. § 703. Because the Comptroller General is an officer of the United States, the district court was well within its discretion in dispensing with the federal rules in this case.

MDC also claims that significant factual disputes make this case inappropriate for summary disposition. We disagree. Departing from the summary nature of a subpoena enforcement proceeding is the exception rather than the rule. *See United States v. Moon,* 616 F.2d 1043, 1047 (8th Cir.1980); *Lask,* 703 F.2d at 300. "Before the district court need hold an evidentiary hearing, the respondent must show that there are disputed questions of fact whose resolution would warrant refusing enforcement of the subpoena." *Federal Trade Commission v. MacArthur,* 532 F.2d 1135, 1141 (7th Cir.1976). Our review leads us to conclude that MDC has failed to "show that there are disputed questions of fact whose resolution would warrant refusing enforcement of the subpoena." *Id.* We believe that the issues before the district court were properly resolved on the basis of the parties' affidavits and briefs.

## B. Due Process

█ MDC contends that the district court's use of summary proceedings violated the due process clause of the Fifth Amendment. As previously indicated, MDC contends that this case involves several disputed and controlling factual issues and thus it was entitled to a plenary adversary hearing on these issues in the district court.

Three factual issues are raised by MDC in support of its claim that dispensing of this case by summary proceedings was improper. MDC contends that it was necessary for the district court to hear evidence from the parties to the contract on the kinds of documents they intended to be reachable under the access clause, and to hear evidence defining the documents subpoenaed to enable the court to determine whether the documents fall within the confines of the parties' intent. The scope of the CG's authority under the access to records clause, however, turns on the meaning of the language of the clause, not on the intention of the parties to the contract, *Bowsher,* 103 S.Ct. at 1591 n. 6, and there is no dispute between the parties as to what documents are being subpoenaed. The documents to which the CG seeks access are clearly defined in the subpoena that was before the district court. There was no need for an evidentiary hearing in order to enable the district court judge to make a legal determination as to whether the documents subpoenaed are reachable under the access clause of the parties' contract.

Second, MDC contends that there was a significant factual dispute respecting whether public or appropriated funds were used to purchase the aircraft from MDC. Because the access clause was included in the contract by agreement of the parties, resolution of this factual issue is unnecessary.

Third, MDC argues that resolving the parties' factual dispute over the date of final payment on the contract is necessary

to deciding its claim that the CG's subpoena enforcement proceeding was untimely filed under the access clause in the contract. As we have previously discussed, however, a determination as to the date of final payment under the contract is unnecessary to resolving the timeliness question.

MDC has failed to raise any significant factual questions that would have necessitated an evidentiary hearing before the district court. We reiterate that departing from the summary nature of a subpoena enforcement proceeding is the exception rather than the rule. *Moon,* 616 F.2d at 1047. We cannot conclude that MDC has suffered a deprivation of due process in this case.

C. Findings Below

MDC asks that we vacate the judgment of the district court and remand this case to the district court with directions to find the facts and state separately its conclusions of law. We decline to do so.

The district court, in a memorandum dated December 14, 1982, stated the undisputed facts. Clearly, there were a number of pertinent facts not in dispute. MDC is primarily complaining about a lack of findings respecting the same issues we have addressed in connection with our discussion on due process. As we previously indicated, the taking of evidence and the finding of facts on those issues is unnecessary to resolving this case. Although in its final decision ordering MDC to produce the subpoenaed documents the district court does not specifically state that the documents fall within the reach of the access clause of the contract, it is implicit that the district court so found. We believe that the district court made ample findings to support the result reached in this subpoena enforcement proceeding.

After carefully considering the issues raised and the arguments made by the parties, we affirm the judgment of the district court.