In re SUNBELT FREIGHT, INC., Debtor.

SUNBELT FREIGHT, INC., Plaintiff,

v.

ADVANCED PRECISION FABRICATORS, INC.; Continental Timber Company, Inc.; Tom L. Davis Lumber Co.; General Purpose Steel, Inc.; IKG Borden, Division of Harsco Corp.; Pennco Pipe & Tube Corp.; Walter N. Fields Lumber Company; and West Texas Culvert, Inc., Defendants.

Bankruptcy No. 91-01539-W.

Adv. No. 93-0120-W.

United States Bankruptcy Court, N.D. Oklahoma.

Jan. 7, 1994.

Sam G. Bratton, II, Tulsa, OK, for debtor/plaintiff.

John M. Sharp and William P. Parker, Tulsa, OK, for defendants.

***ORDER DENYING "MOTION OF DEFENDANT GENERAL PURPOSE STEEL, INC. TO ABSTAIN OR IN THE ALTERNATIVE TO STAY PROCEEDINGS PENDING REFERRAL TO INTERSTATE COMMERCE COMMISSION"***

MICKEY DAN WILSON, Chief Judge.

Defendant General Purpose Steel, Inc. ("GPS") moves for abstention from or stay of

---

25. *In re Smartt Construction Co.*, 138 B.R. 269 (D.Colo.1992) ("excusable neglect").

this adversary proceeding "Pending Referral to Interstate Commerce Commission." Plaintiff Sunbelt Freight, Inc. ("Sunbelt") objects. Upon consideration thereof, of statements of counsel made in open court, and of the record herein, the Court determines, concludes and orders as follows.

On May 6, 1991, Sunbelt filed its voluntary petition for relief under 11 U.S.C. Chapter 11 in this Court. On September 3, 1992, Sunbelt's plan of reorganization was confirmed. As Sunbelt observes, it is now "in the final stages of completion of [its] liquidating plan. The plan is substantially consummated, and other than the conclusion of [a] few remaining freight audit proceedings, the case is ready to close," Sunbelt's obj. p. 4.

The "few remaining freight audit proceedings" include the present lawsuit. On April 28, 1993, Sunbelt commenced this adversary proceeding by filing its "Complaint to Recover Motor Carrier Undercharges" against eight different defendants. By now, only one defendant remains, namely GPS.

The complaint alleges that Sunbelt "was ... a common motor carrier operating in interstate commerce ...;" that GPS "tendered freight to [Sunbelt] for transportation in interstate commerce ...;" that Sunbelt performed the services "subject to the ... tariff rates and rules" prescribed by the Interstate Commerce Commission ("ICC"); that Sunbelt "compared the commodities, weights, point of origin, destinations and declared value of each shipment to the applicable tariff rates and rules provisions that [Sunbelt] had filed with the ICC which were effective on the applicable dates of shipment" and billed GPS accordingly; and that GPS was billed for $3,354.19 and ha[s] refused to pay such sum ...," complaint ¶¶ 3, 5, 6, 11. Sunbelt prayed for judgment against GPS for the total bill of $3,354.19 "with interest and costs," complaint p. 5. GPS' answer admits that "from time to time [GPS] engaged the services of [Sunbelt]," but denies that GPS owes Sunbelt "in any amount whatsoever," answer ¶¶ 5, 6. GPS also asserts various "Affirmative Defenses," including the following: that "[s]ome or all of the freight charges sought to be collected ... are unreasonable, and therefore unlawful under [§] 10701(a) of the Interstate Commerce Act," aff. def. ¶ 4; that Sunbelt's tariff rates do not conform to miscellaneous regulations and procedures of the ICC; that Sunbelt's "common carrier tariffs are not applicable to such shipments" because Sunbelt was acting not as a "common carrier" but as a "motor contract carrier" or "property broker" or "shipper's agent" or "surface freight forwarder," id. ¶¶ 11, 12; and that GPS "is entitled to set off and/or recoup ... any mutual debts or claims it may have against [Sunbelt]," id. ¶ 16.

On August 3, 1993, a scheduling conference was held. On August 5, 1993, a scheduling order was filed which set pre-trial conference for October 27, 1993 and trial for November 8, 1993.

On September 16, 1993, GPS filed its "Motion ... to Abstain or in the Alternative to Stay Proceedings Pending Referral to Interstate Commerce Commission" and a "Brief in Support ..." thereof. Appended to said "Brief in Support ..." was an "Affidavit of Morton Chatkin, Traffic Manager [of GPS]," which recited in pertinent part as follows:

> In my opinion, the rates contained in the tariff now relied upon by the Trustee of Sunbelt are patently unreasonable.
>
> . . .
>
> Also appended to my affidavit hereto are paid freight bills and/or rate sheets evidencing the rates and charges paid by my company for transportation services identical to those involved here. These documents buttress my conviction and assertion that the rates which Sunbelt now seeks to collect would be found reasonable by ... the [ICC],

affidavit p. 4. On October 12, 1993, Sunbelt filed its "... Objection ..." to GPS' motion. The motion and objection came on for hearing on October 27, 1993. After hearing, the Court took the matter under advisement. Pre-trial conference scheduled for October 27, 1993, and trial scheduled for November 8, 1993, were stricken.

A preliminary issue concerns how long it might take ICC to issue its ruling if this matter were referred. Other Courts have found that "the ICC has an impenetrable backlog of rate reasonableness cases, some of

which have been pending before the agency for as many as eight years," *In re Roberts Carrier Corp.*, 157 B.R. 109, 116 (B.C., M.D.Tenn.1993). GPS informs the Court that ICC has promised to penetrate the "impenetrable backlog" and to dispose of all rate reasonableness cases within one year after their referral. Sunbelt points to the example of a case before the District Court of this District, namely *Emporium Motor Freight v. Evans Box Manufacturing Corporation*, Case No. CIV–91–C–461–E, which was referred to ICC in March 1992 and was ruled on by ICC in June 1993, fifteen months later. Sunbelt proposes that "[t]his is about the shortest length of time one can expect a case to be delayed if referred to the ICC," Sunbelt's obj. p. 5. For purposes of this opinion, this Court determines that referral to the ICC will require an additional delay of at least one year.

GPS states that "[t]his adversary proceeding is basically an action to collect accounts receivable, involving claims independent of bankruptcy law, and is not a core proceeding," motion p. 2 ¶ 3. This Court can hear non-core proceedings, though its power to make final disposition thereof is limited, 28 U.S.C. § 157(a), (c).

But GPS does not ask this Court merely to acknowledge non-core limitations on finality of its decision. GPS asks this Court to either (1) "pursuant to 28 U.S.C. § 1334(c)(2) ... abstain from further proceedings," or (2) "stay and suspend further proceedings herein, pending referral to the ICC ...," motion p. 3 ¶¶ 5, 6. The reference to 28 U.S.C. § 1334(c)(2), so-called "mandatory abstention," appears to be in error, since GPS in its brief argues only 28 U.S.C. § 1334(c)(1), so-called "discretionary abstention."

Although GPS speaks of "referral" to the ICC, there is no procedure whereby a proceeding pending before a court can be "referred" (transferred or removed) to an administrative tribunal like the ICC, *Reiter v. Cooper*, 507 U.S. ——, —— n. 3, 113 S.Ct. 1213, 1220 n. 3, 122 L.Ed.2d 604, 617 n. 3 (1993) (hereinafter "*Reiter v. Cooper*"). GPS would have this Court abstain from or stay its own proceeding, so that the parties may commence a separate proceeding concerning the same issues before the ICC. This Court is asked, not to refer, but to defer, to the ICC.

GPS asks this Court to defer to the ICC for one reason. GPS asserts that its "affirmative defenses" listed above involve "issues over which the ICC ... has primary jurisdiction," motion p. 3 ¶ 5.

49 U.S.C. § 10761(a) provides that a motor carrier subject to the Interstate Commerce Act ("ICA") "may not charge or receive a different compensation for ... transportation or service than the rate specified in the tariff" filed with the ICC, although this filed "rate ... [as well as any] classification, rule, or practice provided by a carrier ... must be reasonable." Pursuant thereto, the U.S. Supreme Court has held that

> Under the interstate commerce act, the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext. Shippers and travelers are charged with notice of it, and they as well as the carrier must abide by it, unless it is found by the [ICC] to be unreasonable. Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. This rule is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination,

*Louisville & Nashville R.R. Co. v. Maxwell*, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853, 855 (1915). Three-quarters of a century later, the Supreme Court continues to insist that enforcement of the filed rate is

> essential to preventing price discrimination and stabilizing rates ... This rigid approach [i]s deemed necessary to prevent carriers from intentionally "misquoting" rates to shippers as a means of offering them rebates or discounts,

*Maislin Industries, U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 126–127, 110 S.Ct. 2759, 2766, 111 L.Ed.2d 94, 108–109 (1990) (hereinafter "*Maislin*"). This rule of rigid adherence to the filed rate as the only lawful rate, notwithstanding occasional "harsh ef-

fects," *id.,* 497 U.S. p. 128, 110 S.Ct. p. 2766, 111 L.Ed.2d p. 109, is known as the "filed rate doctrine."

Courts adhere strictly to the filed rate, precisely because carriers and shippers do not. Specially negotiated rates undercutting the filed rates and subverting the ICA's regulatory scheme are common. So are lawsuits brought by carriers who decide *post delicto* that they should have charged the lawful rate.

> The well-worn choreography for these cases involves a motor carrier's action against a shipper to collect for undercharges; that is, to collect the difference between the higher rate which the carrier has filed with the [ICC] ... and the rate which the parties had negotiated,

*Matter of Caravan Refrigerated Cargo, Inc.,* 864 F.2d 388, 388–89 (5th Circ.1989), cert. den. sub nom. *Supreme Beef Processors, Inc. v. Yaquinto,* 497 U.S. 1010, 110 S.Ct. 3254, 111 L.Ed.2d 763 (1990), abrogated on other grounds by *Advance United Expressways, Inc. v. Eastman Kodak Company,* 965 F.2d 1347 (5th Circ.1992), which in turn was overruled in part by *Reiter v. Cooper,* as acknowledged by *Advance United Expressways, Inc. v. Eastman Kodak Company,* 990 F.2d 184 (5th Circ.1993).

> Shippers' standard defenses against such 'undercharge' actions have been (1) that the carrier's attempt to collect more than the agreed-upon rates is an 'unreasonable practice' proscribed by the [ICA], see § 10701(a), and (2) that the tariff rates were unlawful because they were unreasonably high, see ibid.,

*Reiter v. Cooper,* 507 U.S. p. ——, 113 S.Ct. p. 1216, 122 L.Ed.2d p. 613. The first defense, that enforcement of the filed rate is itself an "unreasonable practice," was an attempt to turn the ICA against itself. This perverse argument was rejected by the Supreme Court in *Maislin,* thus eliminating the first defense in undercharge cases. The second defense, that a filed rate is "unreasonable," continues to appear in undercharge cases. With it there now appear other defenses, such as that the filed rate is inapplicable because the carrier which filed them is not a "common carrier" but a "motor contract carrier" or some other variety of carrier.

■ Determination of what is an "unreasonable rate" or "common carrier" clearly *can* be made by the ICC. Whether such determinations *must* be made by the ICC is a different question. No statute deprives courts of jurisdiction, or requires courts to defer to the ICC, in such matters. There does exist a conditional restraint which courts have imposed upon themselves, called the "doctrine of primary jurisdiction."

The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. "Exhaustion" applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course. "Primary jurisdiction," on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation. These reasons and purposes have often been given expression by this Court. In the earlier cases emphasis was laid on the desirable uniformity which would obtain if initially a specialized agency passed on certain types of administrative questions. More recently the expert and specialized knowledge of the agencies involved has been particularly stressed. The two factors are part of the same principle, "now firmly established, that in cases raising issues of fact not within the conventional experience of judges or cases requir-

ing the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over ... Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure,"

*U.S. v. Western Pacific Railroad Company,* 352 U.S. 59, 63–65, 77 S.Ct. 161, 164–66, 1 L.Ed.2d 126, 132 (1956) (hereinafter *"Western Pacific"*) quoting *Far East Conference v. U.S.,* 342 U.S. 570, 574–575, 72 S.Ct. 492, 494–495, 96 L.Ed. 576, 582 (1952); and see *Marshall v. El Paso Natural Gas Co.,* 874 F.2d 1373 (10th Circ.1989). It must be emphasized that the doctrine of primary jurisdiction is not "an abstraction to be called into operation at the whim of the pleader," *Western Pacific* 352 U.S. p. 69, 77 S.Ct. p. 167, 1 L.Ed.2d p. 135. Rather, it is a pragmatic rule of judicial deference "based on the particular facts of each case," *id.*

[A] ... court in its discretion should invoke primary jurisdiction and defer only if the benefits of obtaining the agency's aid outweigh the need to resolve the litigation expeditiously. The ... court may consider many factors in striking this balance ...,

*Gulf States Utilities Co. v. Alabama Power Co.,* 824 F.2d 1465, 1473 (5th Circ.1987) quoted with approval in *Mical Communications, Inc. v. Sprint Telemedia, Inc.,* 1 F.3d 1031, 1038 (10th Circ.1993). It is even held that, to guard against unnecessary delay and expense, the doctrine of primary jurisdiction should be invoked "seldom," *Locust Cartage Co. v. Transamerican Freight Lines, Inc.,* 430 F.2d 334, 340 n. 5 (1st Circ.1970), cert. den. 400 U.S. 964, 91 S.Ct. 365, 27 L.Ed.2d 383 (1971), "reluctant[ly]," *Mississippi Power & Light Co. v. United Gas Pipe Line Co.,* 532 F.2d 412, 419 (5th Circ.1976), cert. den. 429 U.S. 1094, 97 S.Ct. 1109, 51 L.Ed.2d 541 (1977), and "sparingly," *Red Lake Band of Chippewa Indians v. Barlow,* 846 F.2d 474,

476 (8th Circ.1988) citing *U.S. v. McDonnell Douglas Corp.,* 751 F.2d 220, 224 (8th Circ. 1984).

According to GPS, the case of *Reiter v. Cooper* holds "in effect, that the ICC has primary jurisdiction over rate reasonableness type issues, and ... approve[s] the practice of 'referring' the issue of rate reasonableness and determination of unlawful rates to the ICC," brief p. 8. This Court reads *Reiter v. Cooper* to hold nearly the opposite. Before analyzing the case itself, the Court discusses its legal context.

Before *Reiter v. Cooper,* the U.S. Supreme Court had never reached the issue of whether or to what extent the ICC has "primary jurisdiction" in cases involving issues of allegedly unreasonable rates. In *Maislin,* the District Court had "f[ound] the ... matters to be within the primary jurisdiction of the ICC ... [and] stayed the proceeding ... and referred the case to the [ICC]," 497 U.S. p. 122, 110 S.Ct. p. 2764, 111 L.Ed.2d p. 106. The Supreme Court was not asked to, and did not, review this part of the decision below. The Supreme Court noted that "[t]he issue of the reasonableness of the tariff rates is open for exploration on remand," 497 U.S. p. 130 n. 10, 110 S.Ct. p. 2768 n. 10, 111 L.Ed.2d p. 110 n. 10, but made no comment on how such "exploration" might take place. Accordingly, the Court of Appeals for the Fourth Circuit determined as follows:

... [T]he question remains of whether the cases should be remanded for re-referral to the ICC. This question is one that the Supreme Court has not decided and on which there is no precedent in this circuit ... We believe that the Court's decisions are correctly read as taking no position on whether re-referral to the ICC is required in such cases,

*In re Carolina Motor Express, Inc.,* 949 F.2d 107, 110 (4th Circ.1991). This decision was appealed to the Supreme Court under the name of *Reiter v. Cooper.*

In 1986, Carolina Motor Express, Inc. ("Carolina") filed bankruptcy. Langdon M. Cooper ("Cooper") was appointed Trustee. Cooper sued some of Carolina's former customers, including Peter C. Reiter and others ("Reiter"), to recover undercharges. Reiter

asserted, among other things, that Carolina's filed rates were "unreasonable;" and moved for referral of this issue to the ICC. The Bankruptcy Court denied Reiter's motion and entered judgment for Cooper, *In re Carolina Motor Express, Inc.,* 84 B.R. 979 (B.C., W.D.N.C.1988). The Bankruptcy Court held that the "filed rate doctrine" required judgment for Cooper absolutely regardless of anything else, so long as the filed rate had not previously been "found unlawful" by the ICC, 84 B.R. p. 989. The District Court reversed, referred the reasonable-rate question to the ICC, and apparently stayed other proceedings meanwhile. The Court of Appeals for the Fourth Circuit reversed the District Court, *In re Carolina Motor Express, Inc.,* 949 F.2d 107 (4th Circ.1991). The 4th Circuit Court ruled as follows: the "filed rate" doctrine compelled judgment in favor of Cooper on his complaint to recover the official tariff charges, whether these official rates were "reasonable" or not; if Reiter wished to challenge the reasonableness of the filed rates, Reiter could do so, but *only* by separate action before the ICC; and if ICC agreed with him, then Reiter could seek "reparations from the carrier," 949 F.2d p. 110. The 4th Circuit believed that such bifurcation of the case was a practical necessity: any other course would encourage "shippers routinely to contest the validity of the carrier's rates in order to delay paying the carrier's filed rate," *id.* On appeal to the Supreme Court, it was *the carrier* (or rather its Trustee) who argued that the ICC had "primary jurisdiction" of the rate-reasonableness question. That is, the Trustee argued that the Bankruptcy and District Courts had exclusive jurisdiction of the Trustee's complaint (which the ICC could not entertain), while the ICC had primary jurisdiction of Reiter's defense (which the courts could not entertain), so that the 4th Circuit's bifurcation of complaint and defense was the only possible procedure under the circumstances. The Supreme Court, per Mr. Justice Scalia, disagreed.

According to Justice Scalia, the dispute came to the Supreme Court in a rather confused state. The doctrine of primary jurisdiction had not been properly put before the Court at all, because "the result that [the Trustee] seek[s] would be produced, not by the doctrine of primary jurisdiction, but by

the doctrine of exhaustion of administrative remedies," *Reiter v. Cooper,* 507 U.S. p. ——, 113 S.Ct. p. 1220, 122 L.Ed.2d p. 618. The Trustee's proposition, that "the doctrine of primary jurisdiction *requires* [defendants] initially to present their unreasonable-rate claims to the ICC ... rather than to a court," was "mistaken," *id.* p. ——, 113 S.Ct. p. 1219, 122 L.Ed.2d p. 617 (emphasis added). More important, Reiter's defense was actually not a "defense" at all. "[A]n unreasonable-rate claim is technically a counterclaim rather than a defense," *id.* p. ——, 113 S.Ct. p. 1218, 122 L.Ed.2d p. 615. Such counterclaims were brought by the shipper against the carrier "for damages ... in the amount of the difference between the tariff rate and the rate determined to be reasonable," *id.* p. ——, 113 S.Ct. p. 1217, 122 L.Ed.2d p. 614. They merely happened to be asserted "defensively" in lawsuits of this type, in the nature of " 'set-offs and recoupments,' " *id.* Such a defensive counterclaim might, or might not, "be adjudicated separately from the plaintiff's claim to which it applies," *id.* p. ——, 113 S.Ct. p. 1218, 122 L.Ed.2d p. 615. The decision whether or not to bifurcate "is largely discretionary ... to be exercised in light of 'judicial administrative interests as well as the equities involved,' " *id.* quoting *Curtiss–Wright Corp. v. General Electric Co.,* 446 U.S. 1, 8, 100 S.Ct. 1460, 1464, 64 L.Ed.2d 1 (1980). In terms of modern procedure, it was a question of whether or not to enter separate final judgment under F.R.Civ.P. 54(b). In this case, "[n]either the Court of Appeals nor the District Court made the 'express determination' required under Rule 54(b) for entry of a separate judgment," *id.* p. ——, 113 S.Ct. p. 1221, 122 L.Ed.2d p. 619. Moreover, "the equities" in the matter, especially the effects of "bankruptcy ... [and] insolvency," were unclear, *id.* Accordingly, the Supreme Court reversed and remanded, so that such issues might be taken up by the courts below.

As a court of appeal, the Supreme Court was apparently concerned mainly with appealability—with implementing F.R.Civ.P. 54(b), in an exercise of accommodating the best interest of the parties in the particular case with " 'the historic federal policy against

piecemeal appeals,'" *Reiter v. Cooper*, 507 U.S. p. ——, 113 S.Ct. p. 1218, 122 L.Ed.2d p. 615, quoting *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 438, 76 S.Ct. 895, 901, 100 L.Ed. 1297, 1307 (1956). The Supreme Court did not clearly distinguish separate final judgment under F.R.Civ.P. 54(b) from primary jurisdiction—apparently because the Court saw the two rules as functionally similar, so that a clear distinction between them was unnecessary. Both rules are "largely discretionary," *id.* Here is no commandment to concede primary jurisdiction to the ICC in all reasonable-rate cases, no matter what. Here instead is a directive to use discretion according to the equities. But in this particular instance, the Supreme Court *rejected* the Trustee's argument that the ICC had primary jurisdiction, and *reversed* the Court of Appeals' decision to bifurcate the case. This is why *Reiter v. Cooper* actually holds nearly the opposite of what GPS says it holds.

This Court must apply these principles to the matter at bar.

Since the ICC does not have exclusive initial jurisdiction of this matter, the doctrine of primary jurisdiction (and not exhaustion of administrative remedies) applies here. This Court must determine, according to "no fixed formula," what disposition would best "promot[e] proper relationships between [this Bankruptcy Court] and [the ICC]," taking into account such factors as "desirable uniformity" "under a regulatory scheme," "expert and specialized knowledge," possible "issues of fact not within the conventional experience of judges" or "exercise of administrative discretion," "the limited functions of review by the judiciary," and "more flexible procedure," *U.S. v. Western Pacific Railroad Company*, supra. It is a question of "reasons ... and ... purposes" as applied "in the particular litigation," *id.* It is also a question of "equities," especially those equities involving the effects of "bankruptcy ... [and] insolvency," *Reiter v. Cooper*, 507 U.S. p. ——, 113 S.Ct. p. 1217, 122 L.Ed.2d p. 614.

"Many courts have held that '[t]o justify referral to the ICC, the shipper must at least make a threshold showing that the filed rates are unreasonable,'" *In re Roberts Carrier Corp.*, 157 B.R. p. 114 (quoting and citing cases). Here, GPS offers its own traffic manager's opinion that Sunbelt's filed rates are "patently unreasonable," and copies of documents tending to show that GPS often pays rates lower than Sunbelt's filed rates. The self-serving, conclusory, bald statement of opinion is the same as no evidence at all. The evidence of other rates is ambivalent—it may show that Sunbelt's legal rates are too high, or it may show merely that GPS prefers to do business by taking advantage of illegal price wars among carriers. For purposes of this opinion, this Court determines that the evidence of other rates, though ambivalent, is sufficient to make a threshold showing that Sunbelt's rates may be unreasonable. This is one factor which "justifies" deferral to the ICC. But it is not the only factor; and it does not *compel* deferral to the ICC. Other factors must still be considered.

At hearing, GPS conceded as much. GPS declared that, if this Court did refer the matter to ICC and ICC proved dilatory, this Court might then in its sound discretion take remedial action notwithstanding ICC's "primary jurisdiction." What is discretionary a year from now, is discretionary now. Of course, in exercising its discretion now, the Court must consider whether it is worthwhile to wait a year to see what ICC may do.

In most cases, it is worthwhile to wait on ICC. The average lawsuit in Federal District Court will take at least a year to go to judgment anyway; so little time is lost (and some may even be saved) by allowing ICC to spend a year or so "clearing the ground." Further, the dispute arises in the course of ongoing business between the parties, and its resolution necessarily affects future regulation of interstate commerce. Under such circumstances, there is really no reason why a Federal court should *not* defer to the ICC. It is therefore not surprising that Federal courts have often conceded "primary jurisdiction" to the ICC.

■ But this is not the usual case. This is a bankruptcy case in its last throes.

[Sunbelt] is in the final stages of completion of a liquidating plan. The plan is substantially consummated, and other than

the conclusion of the few remaining freight audit proceedings, the case is ready to close ... Referral to the ICC will only cause substantial and unnecessary delay in closing the case without conferring any benefit to either party, the creditors of the Estate or the public. Referral would only add another rate case (a small one at that) to the ICC's docket and cause added expense to both parties,

Sunbelt's obj. p. 4. The ICC will be especially uninterested in this case because Sunbelt has already gone out of business.

A decision by this Court ... in this particular case ... will not impact or affect the regulation of the trucking industry nor bear upon [Sunbelt's] non-existent operations. The ... fact-based determination in this proceeding is not susceptible of impacting the industry regulated by the ICC,

*id.* p. 3. The parties most interested in resolution of this proceeding (apart from the plaintiff and defendant themselves) are the creditors of Sunbelt, who have already been waiting for two years for such repayment of their claims as Sunbelt's estate can give them.

Factors of time and laches play a part in determinations of primary jurisdiction, *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, supra; *In re Sharm Express, Inc.*, 127 B.R. 620, 625 (D.Minn.1991). In the matter now before this Court, GPS did not even move for referral to the ICC until after GPS had answered and this Court had issued its scheduling order setting trial for November 8, 1993. If GPS had not moved for referral to the ICC, this adversary proceeding *would already have been tried* by this Court on November 8, 1993. It is certain that ICC could not have made its ruling sooner than this Court could have brought the matter to trial—that is, between September 16, 1993 (when GPS filed its motion for referral) and November 8, 1993 (when this matter would have come on for trial before this Court). It is unlikely in the extreme that ICC can make its ruling sooner than this Court can bring the matter back to trial.

Indeed, it appears that referral of this matter to ICC would merely add to ICC's burdens, slowing down ICC's consideration of other rate-reasonableness cases involving "live" businesses which may be much more important to ICC's effective administration. It is possible, or even likely, that this Court can best help ICC by disposing of this case without inflicting it on ICC.

Under such circumstances, it is not worthwhile to wait on ICC. Delay is not worth this Court's while, Sunbelt's while, the creditors' while, or ICC's while. It is not even worth GPS' while, except insofar as long delay and repetitive litigation would put pressure on Sunbelt to settle in GPS' favor. The latter is not a legitimate reason for referral to the ICC. A court should "refer a matter to the ICC when it believes the agency's rate determination will assist in resolving the entire dispute," *Covey v. ConAgra, Inc.*, 763 F.Supp. 479, 482 (D.Colo.1991). Here, referral to the ICC would assist in *not* resolving the dispute.

The same considerations apply to the issue of whether Sunbelt was acting as a "common carrier." However, even in the absence of special circumstances, other courts have held that "[t]he question whether this debtor was ... a 'common carrier' is a run-of-the-mill legal question" which is within the competence of courts and is not within the ICC's primary jurisdiction, *In re Roberts Carrier Corp.*, 157 B.R. pp. 111–113 (citing cases). This Court agrees.

All things considered, here "the benefits of obtaining the agency's aid" are outweighed by "the need to resolve the litigation expeditiously," *Gulf States Utilities Co. v. Alabama Power Co.*, supra, quoted in *Mical Communications, Inc. v. Spring Telemedia, Inc.*, supra. Therefore, this Court need not and should not defer to the ICC for its preliminary determination of any of the issues in this adversary proceeding. In other words, none of the issues in this adversary proceeding are within the ICC's "primary jurisdiction."

Accordingly, the "Motion of Defendant General Purpose Steel, Inc. to Abstain Or In the Alternative to Stay Proceedings Pending Referral to Interstate Commerce Commission" is hereby denied.

AND IT IS SO ORDERED.